Before we begin, I want to again acknowledge the presence and express our gratitude for the presence today of the Honorable Harold Ackerman, who is a very distinguished judge from the District of New Jersey, who is here helping us out today and had sat with us last week. And we appreciate very much your help and your intellect and the guidance you have given us on these cases. Thank you, Judge McKee and Judge Averill. Thank you very much. Good sitting with you. U.S. v. Lafferty Good morning, Your Honors. May I please report? My name is Kimberly Brunson. I represent the appellant in this matter, Amy Lafferty. With the Court's permission, I'd like to reserve three minutes for rebuttal. That's granted. Maybe you can help me with something. I'm not sure in reading your brief. Are you objecting? I know you're making a number of objections. Do they include the procedure the district court set up for determining whether or not this is an adoptive admission? Or are you saying you're content with that procedure? No, we're not content with that procedure because of the statements being testimonial hearsay. And the Court's procedure was to make the preliminary determination, then submit the ultimate issue to the jury for its determination, and to cure any prejudice or any Sixth Amendment violation by instructing the jury to not consider Mr. Mitchell's statements. It's the wackiest procedure I've ever seen. It's bizarre. It is very strange, Your Honors. And this case actually presents three issues, as I'm sure you're aware. Although not briefed in this order, I think probably from a practical standpoint, the Court would address first the last issue, which is did police officers scrupulously honor Ms. Lafferty's invocation of her right to remain silent prior to interrogating her? They knew she was addicted to a CDS, did they not? They did know she was an addict. And, in fact, as I'm sure you're aware, Your Honor, the first interrogation was stopped. Do you feel that in terms of whether they scrupulously honored her right to remain silent, that they also took subtle advantage of her condition? It's very possible, Your Honor, as I'm sure you can see from looking through the record, there's no evidence that any of the police officers who were present ever addressed her specifically and asked her, do you want to talk to us again? She was very clear at the end of the first interview on January 15, 2003, I don't want to talk to you anymore. The interview was ended. They did honor her decision at that point in time, transported her along with her boyfriend, Mr. Mitchell, to the magistrate's office. But, as I point out in my reply brief at pages 11 and 12, all of the evidence discusses Mr. Mitchell's statements. Mr. Mitchell indicated, I want to talk to Ms. Lafferty. If you let us talk, we'll talk to you. The knife would cut both ways on some of this. If Mitchell, her co-defendant, co-conspirator, whatever you want to call it, is beginning the discussion and is saying, let me have a chance, what is a police officer to do other than to let him have a chance to talk with her? The police officers are well-educated in the area of the law. They've dealt with Ms. Lafferty many times. The least they could do is say to her, is that what you want? She made no affirmative representation. At the 1 o'clock, she did say she was given Miranda White's rights, and I think she signed a waiver at 1 o'clock. She remained silent at 1 o'clock, is that right, on the 15th? Yes, the second interview? No, the second interview, which is at 1 o'clock on the 15th. The third is at 5 o'clock on the 15th. So what happened at 1 o'clock? I know she was advised of her Miranda rights, and I'm not certain if she signed a waiver or not, but she did voluntarily talk with police officers at that time. She did sign a waiver. She was read the Miranda warnings and signed a waiver. And then in that interview, she terminated it by saying, I don't want to talk to you anymore, and invoked her Fifth Amendment right to remain silent. In your judgment, did they scrupulously honor her right to remain silent? Absolutely not, Your Honor. Well, at that point in time, they did, yes. But later, no, they did not. What were they doing, in your judgment? Wearing her down? Yes, they questioned her now three times within the course of several days about the same criminal incident. This is different from Mosley, where the Supreme Court said, all right, the police officers have scrupulously honored the defendant's right to remain silent by giving a new set of Miranda warnings and questioning him about a separate incident. So they did not try to wear down the defendant's choice in that case to invoke his Fifth Amendment right as to that particular criminal episode. But this is not Vujocevic, though. Pardon me? This is not a case like Vujocevic, where it seemed like a clock. They'd come in and hit her with Miranda warnings again, hit her with Miranda warnings again. Finally, they got a waiver. This is not this case. It's not identical, but it is similar in that they did question her three times on the same criminal episode. Well, the third time, they didn't question her. They questioned Mitchell in her presence. You can argue that that was contrived to get her to do exactly what she did. Indeed. She was in police custody. She was in the police car with them. She was brought back, put in a room with him. She was never asked. But that was at his request. That was at his request. Do we have any indication, I mean, in that it was about 40 minutes that they questioned her or questioned them in the room at 5 o'clock? Is that about right? It was about an hour. About an hour. And during the course of that time, she didn't say, I don't want to be here. She didn't say, like she did at 1 o'clock, that I'm invoking my right to remain silent. And, in fact, after about the first eight minutes, she began to nod and answer certain points or clarify certain points that Mitchell was making, didn't she? She did. But, Your Honor, her testimony was later at a suppression hearing that she felt she had no choice. She had already told them, I don't want to talk to you. She's in police custody. She's kept in police custody. She's transported back, put in the room with her boyfriend. And they asked him on the record at the beginning of the interview, Dave, are you willing to give up? He had actually invoked his right to an attorney. Do you want to waive that right? The least any of these officers could have done, I believe there were four police officers, would say, Amy, are you in agreement with this? Do you want to talk to us? We know that you stopped our interrogation of you earlier. Now, she's no Dave in the woods. She is not. But the Fifth Amendment does not exclude her from its sanction, does it? I'm sorry. In other words, she is protected to the extent that the amendment protects her in terms of scrupulously preserving her right to remain silent. Absolutely, Your Honor. And, in fact, it seems that the government is trying to shift the burden to the defendant, that when she was approached, when her boyfriend said, I want to be interviewed again, and the police took them, that she had some duty to say, I don't want, I'm still invoking my right to remain silent. The lie is, as the Supreme Court has established, once a defendant invokes their right to remain silent, the police officers have a duty to scrupulously honor that right. They cannot then attempt, through someone else or through themselves, to wear down the defendant's decision to assert their constitutional right. Insofar, as I said, I believe that this would be the Court's first area in which to inquire, because if her rights were not scrupulously honored, neither her statements nor Mr. Mitchell's can be admissible against her. Well, her statements are not coming in in any event, are they? It's just Mitchell's statements? Well, no, you're right. Her statements to Mitchell and her part of that conversation, to the extent it was a conversation, that is coming in. Correct. And under the Court's analysis, currently a district court. The second issue is, is the Confrontation Clause violated by the admission of Mr. Mitchell's testimonial statements, where he is available to testify because he has pled guilty and therefore waived. Obviously, you have to look at this in light of what, Crawford? In light of Crawford, you're right, Your Honor. And how does that help you? Because the Supreme Court was very clear in Crawford that where you have testimonial, and it was very specific, first of all. That an interrogation was testimonial? Yes, in distinguishing between testimonial and non-testimonial hearsay. This is testimonial. Police were interrogating Mr. Mitchell and Ms. Lafferty to inquire about past events for future prosecution. This was not in response to an emergency situation, as was present in the subsequent Supreme Court case, Davis. And they were very clear that the Constitution, the Sixth Amendment, demands two things. Unavailability and a prior opportunity for cross-examination. Mr. Mitchell, for whatever reason, the government has chosen or apparently has chosen not to call him as a witness. But her Sixth Amendment right to confront him requires that he be brought before the jury. And, in fact, the district court notes, I believe it's in footnote four in Lafferty 1, that if there was evidence of coercion by Mitchell or influence by law enforcement, as influenced by law enforcement, it could destroy any adoptive admission. There's no way to put that evidence. Without the opportunity to cross-examine Mr. Mitchell, there's no way to even inquire as to whether this sort of evidence existed. Previously, if you had a statement made to someone who is a declarant who was in the presence of the defendant and the defendant doesn't say anything, that silence would come in as an adoptive. In the old days, that wouldn't even – I guess you wouldn't say whether it's hearsay or not. You would say that it just comes in because she was there. It could still come in, Your Honor, under an adoptive admission if it's not testimonial evidence. For instance, if this were in the context of Mr. Mitchell stating something to a third party where Ms. Lafferty is there, but not in the context of a police interrogation and therefore testimonial. But that's the key. It's a police interrogation. But it seems to me it may still come in because Crawford – I'm not sure Crawford does apply in the context of a non-custodial adoptive admission, which traditionally would not be deemed as hearsay anyhow. It's the person's own statement. The only issue is whether or not the facts are sufficient to establish that it is the person, the defendant's own statement. But that's not really Crawford. But we have a custodial interrogation. It seems to me that's very, very different. It is, Your Honor. There is this custodial interrogation. There's a – you know, the government is attempting to use illegal fiction in the rules of evidence in order to allow this evidence to come in. In fact, there's really no way around the reality that Ms. Lafferty is not the declarant. She's not the one who spoke. So Mr. Mitchell spoke. It is testimonial in the context of custodial interrogation. Mr. Mitchell spoke. He inculpated Ms. Lafferty. That is testimonial hearsay. And the Supreme Court in Crawford is very, very clear that you must have unavailability and a prior opportunity for cross-examination and that the Sixth Amendment should not be left to the vagarities of evidentiary law. That is, in fact, what's happening here. Would the introduction of Mitchell's statements be for hearsay purposes or just to provide context? I think it's quite clear they are – they have proof beyond just the – they are for hearsay purposes, that she, in fact, was involved in the burglary of the Mountain Man sports shop. Okay. Then in light – is that protected in light of Crawford? Her statements or his statements? I'm sorry. Well, Mitchell's statements. Mitchell's statements, yes. They're not – the government argues they're not introduced for hearsay purposes. They're introduced for the purpose of giving context to the adoptive admission of Lafferty. I think if you read the transcript of the joint interrogation, it's very clear that these – this is more than just context. It goes on for probably 30 pages. She speaks very little in this actual interrogation. So it's admitted for the truth of the matter. It is admitted for the truth of the matter, asserted. In fact, if they're not admitted for the truth, they're totally irrelevant. They have no meaning. They don't mean anything if they don't come in for the truth because there's nothing to give context to because everything – the statement is really Mitchell's statement, and then she adds some detail here and there, but that detail is just that. It's a detail to Mitchell's – it's gloss almost on what he was telling them. That's exactly right, Your Honor. I see my time is up. Did you save time? I don't know if you did or not. Three minutes. Okay. Yeah. Yeah. Sherman. Good morning. Very pleased to court. I'm Robert Eppard, assistant U.S. attorney representing the government, Appleby. Can we just start where we left off for a moment, and then we'll get on to the Miranda issue? What was the law way back when with respect to hearsay or adoptive admissions? I think it's well-established. Adoptive admissions has been an exception to the hearsay rule based upon the determination which Judge McKee, in your recent opinion in the non-presidential Webb case, reflected the fact that an adopted admission is tantamount to the defendant's own statement, not the statement of another. Well, that's not hearsay. It's considered under the law the person's own statement. So it's not hearsay if it is an adopted admission. And I would suggest that the issue before this court – But how would an adoptive admission have been handled back at the beginning, 1791, 1789? I don't know exactly how it would have been handled back then. He's not suggesting, despite your gray hair and receding hairline, you were around back then. He's saying maybe your scholarly pursuits have led you into some treatise that maybe would help you answer the question. What we're trying to do is complete up the problem. Counsel, counsel, in a constitutional sense, what the police did here, was that fair? Absolutely, Your Honor. Why? Tell me. Because it was a changed circumstance that was not coerced. There's no assertion in the court below by anyone, including the fact that Ms. Lafferty testified at the suppression hearing and made no assertion that she was in any way coerced by Mr. Mitchell. But that's only part of Miranda. The other part is right to counsel, and she was never warned again. She's just placed in a room, granted not at her suggestion, at the boyfriend's suggestion. She's placed in a room after having previously invoked her right to cut off questions. She's placed in a room. It is a very bizarre. Maybe they do things differently in Pittsburgh. But she's put in a room. The boyfriend starts talking. She starts flushing out some of what he's saying. And then we're in a situation where the trial court says that when it gets to trial, she will instruct the jury that if they find that a reasonable person, maybe I'm missing something because it seems so bizarre that I think I am missing something, that she will instruct the jury that if they find that a reasonable, an innocent person in that circumstance would have spoken up and said something and she didn't speak up, or if her going along with the boyfriend's statement would, under normal circumstances, suggest she agreed with what the boyfriend was saying, it becomes an adoptive admission in her own statement. Is that what happened here? Absolutely not. I think what the court determined below was that the initial question for the court is whether or not it's an adoptive admission and makes a preliminary determination of whether or not. But how do you determine that? An adoptive admission happens usually when a statement is made in the presence of someone  either says something to overtly affirm it, like in Allen, which the district court relied upon, and that was not custodial, or the person simply remains silent in the face of circumstances where it's reasonable to assume that a person would have spoken up had the statement of the declarant not been true. Correct. But the Fifth Amendment, I didn't see the Times this morning, is that still living under the Fifth Amendment? So how are we not using her silence against her? We're saying if she doesn't speak up. Because we're clearly not doing that. This is not a case where Miss Lafferty was silent. It's worse. During custodial. Why do you say that? The word scrupulously honor, what does that mean to you in a constitutional sense in terms of interrogation of an individual who up to that point has remained silent? She was advised again before the second January 15th statement that she made of her constitutional rights. And following that, she came to the point where she said, I don't want to answer any more questions. No, she did not. That was the one o'clock. As Judge Ambrose pointed out, there were two interrogations. But at five o'clock, they didn't read her Miranda rights. They didn't. The record is clear, they did. They did? They did. But what did she say? She did not. She was not asked to sign another waiver form at five o'clock. Well, what is this? A matter if you don't succeed, try, try again? Is that what the Fifth Amendment is about? Well, as Judge Ambrose pointed out, what are the police supposed to do when Mr. Mitchell has asked for an opportunity to talk? Actually, that was a softball because the answer may be they should have gone into the magistrate because they'd already been outside the magistrate's presence for how long after the arrest at that point? Well, they were at the police headquarters for two hours preparing the documents to go to the magistrate. They were on their way. They hadn't arrived at the magistrate's office. But they were in the parking lot of the magistrate's office. And Mr. Mitchell said, give me an opportunity to talk to Amy Patrick. So then they go all the way back to the police station. Three minutes away. I understand. But the question here is, how do you distinguish our court's decision in Tyler, which says, and this is Judge McKee in writing, the appropriate inquiry under Miranda and its progeny is not simply whether the defendant knowingly waived his rights after receiving appropriate warnings. Rather, the inquiry is whether the police scrupulously honored his assertion of his right to remain silent. I think they scrupulously honored Ms. Lafferty's request. Scrupulously? That's a tough adverb for what they did here. I know it's tough, but it's in the context of a request by Mr. Mitchell to speak with his girlfriend and give us an opportunity to talk again. And they did that in private. And they did that in private for 10 minutes. What does that mean? And they gave them Miranda advisements. Counsel, what does that mean, the girlfriend? I mean, we're talking about a defendant here. Mr. Mitchell is Mr. Mitchell. Ms. Lafferty is Ms. Lafferty. Well, they had a relationship that was other than that. So what? She's a defendant, and under the circumstances, doesn't the government have specific responsibilities in terms of its interrogation? I think there are responsibilities that also reflect the fact that if they are requested. Well, she didn't request them. What they should have done was say to her, at the very least, Ms. Lafferty, we understand that you earlier today cut off your right to cut off the questioning. You need to understand that if you come back into the room and interact with Mr. Mitchell or if you say something in response to something Mr. Mitchell is saying, that also could constitute a statement by you that can be used as evidence against you. You have a right not to be present during the course of his statement. You have a right not to say anything during the course of his statement. And then further, which gets to this district court's procedure, if you would like not to say anything and remain silent during his statement, we will not use that statement or the court will not use that silence against you. And that would really dot the i's and cross the t's. Here they undotted the i's. In fact, they shredded the document. Not only did they not dot the i's and cross the t's, it is, I keep saying, it's an amazing procedure. Well, I don't think there's any indication they did anything like that. Wait, wait. Did anything like what? Get rid of any documents. No, I'm not saying they shredded evidence. That's not what I'm talking about. I'm saying that they didn't exactly dot i's and cross t's. They did the reverse. Well, certainly that would be the ideal. Working under the circumstances presented to them. What circumstances? They're calling the shots here. They don't have to let Mitchell engage in a procedure which abrogates Lafferty's right to remain silent or to be represented by counsel unless she agrees to it. They don't have to let Mitchell do that. And she had every opportunity not to agree. She had every opportunity not to agree. And she did. When she was told she had the opportunity not to agree, she stopped questioning. She was advisor of Miranda Rights again at 5 o'clock, and within minutes she gave a statement. But the ball is in your court in terms of your responsibility. Well, I think the findings of fact by the trial judge here fully support the fact that the circumstance had changed. Police officers reasonably responded to those changed circumstances and allowed these two individuals to speak to each other. And within a minute of being given Miranda advisements again, Ms. Lafferty participated in a, you know, the argument initially by the prosecutor was this was a joint statement. And the court rejected that eventually but did find it to be an adoptive admission on the part of Ms. Lafferty. She's a 30-year-old woman who admittedly had been previously advised of Miranda dozens of times. That's in the record. I said she wasn't a babe in the woods. But does the responsibility of the government, is that diminished because of her past? That's the point. I think the totality of circumstances always have to be weighed in determining whether or not there has been a scrupulous honoring of the right to remain silent. She walked out of the 1 o'clock meeting saying, I don't want to talk anymore. She had previously waived her right under the Fifth Amendment. Why isn't that respected then? It was respected. She was on her way to the magistrate's office and this circumstance changes. And the police respond to that circumstance. I think the police would have been criticized if they had not allowed these two to speak. They could have. That's not the point. They could have allowed them to speak. The problem is what happens after that with a situation where she's put in a room where the police have got to as well say something during the course of Mitchell's statement. And maybe they figure, well, this is her lucky day. We can get around Miranda that way. Maybe they are doing this in good faith, whatever. It doesn't seem to matter because, again, we keep coming back to the issue of scrupulously honoring her right to cut off questions and remain silent. And she's put into a situation where the dynamics, she said she felt she had no choice but to comment. And if you look at the circumstances, she's being questioned by four or five police officers in a room with a tape recorder running. I suggest that the opposite is true based on this record. I think it's clear that she made her decision to participate in the joint interrogation with Mr. Mitchell, having previously had the wherewithal and continuing wherewithal. Well, but if you're right about that, then once you give Miranda warnings once and then just bring the defendant back into the interrogation room, you don't have to give Miranda warnings again because you've already warned them and the defendant knows that he or she doesn't really have to say anything. They've already cut off the right to questioning. You don't have to give Miranda warnings again. That's where your argument takes us. I think the law is clear that changed circumstances may require re-Mirandaizing somebody, but a waiver pursuant to that additional Miranda advisement is to be honored. What changed circumstances? We have the Mitchell and Lafferty contact at the request of Mr. Mitchell, and we have a request from the police to both of them, knowing your rights under Miranda, do you wish to give a statement? And they do so. No, no. Okay. They do so. The issue is whether or not she said yes, not whether or not they gave Miranda warnings and then she gives a statement. The police officer testified that she did orally waive her Miranda rights. Now, they didn't get a second written waiver from her because they were concerned about Mr. Mitchell because he had invoked his right to counsel, and they specifically got a written waiver from Mr. Mitchell because they were concerned about that issue with Mr. Mitchell. If I could go on to talk a little bit about the adoptive admission for a minute. Before we leave that, how do you distinguish our Nelson case from 1990, which says that if you use a co-defendant or the police use a co-defendant to procure a confession, that doesn't pass muster necessarily? There's no evidence that the police used the co-defendant. There's no testimony to that effect. Ms. Lafferty testified in a special hearing she never raised that possibility, that she was in any way coerced by her opportunity to talk to Mr. Mitchell. What is she, a mannequin in this passion play? I don't quite understand your point. I'm sorry. Is she some mannequin? My point is that she's a 30-year-old, well-experienced woman who can make her own decisions. What does that mean? She's a defendant. She's a defendant. She's 20 years old, 30 years old, 40 years old. Is it fair? There's nothing to suggest in this record that the police took advantage of Mr. Mitchell. In fact, Mr. Mitchell, if you read the statement, Mr. Mitchell and Ms. Lafferty were trying to get the Russells brought into this as a focus of the police investigation. But is there evidence to show that the police took advantage of her as a defendant in terms of their conduct? I suggest there is none. Okay. And I think the record will bear me out on that. There's nothing to suggest that she, other than her statement that she felt compelled, which I can take it for what it is, there's nothing that she testifies to that says she felt compelled because of Mr. Mitchell. And so there's no use of Mr. Mitchell here. As to the adoptive admission, there are more than 19 verbal responses from Ms. Lafferty during this interrogation. In fact, within seconds, not within minutes of the interrogation beginning, she makes a verbal response. And I would suggest that there is an extensive testimony and statement from Ms. Mitchell in this joint interrogation session. What response did she make at the outset? I thought she was quite a ways in before she really said anything. She talked about, I think I quoted in my brief on page 18, the actual statement that she made with regard to the Russells wanting drugs and they wanted to get proceeds from the guns. The Russells had lent the car that was used in the burglary of the gun shop. And it's clear this statement was intended to bring in the culpability of others and to get some assistance from the police eventually in the disposition of the charges against Ms. Mitchell and Ms. Lafferty. And I would suggest to the court that the issue before this court is limited to the issue of whether or not the statement of Mitchell and Lafferty is properly admitted. And the district court was attempting to establish a procedure whereby, consistent with the same procedure that's followed in Jackson versus Deno hearings, you have a right to have the court rule on a matter of evidence pretrial and then you have a right to have the jury determine whether or not they should reject that evidence on the basis of a conclusion and have the court instruct the jury that this is a legal ruling with regard to what an adoptive admission is and you as jurors can reject that adopted admission even though it has been admitted into evidence. That's clearly the kind of procedure that I think should be followed. California follows it. I think it's the appropriate way to have an adopted admission reviewed again by the jury even though it has been rejected. This is where 104 contemplates. But the issue here is whether or not the circumstances of the adoptive admission lend themselves to a Rule 104 procedure. Your light's on. We did let Ms. Brunson go over a bit. I don't want to cut you off on Doolio. It's been on for a while. Do you want to just wrap up your argument? I would suggest to the court the only issue before this court that should be reviewed is whether or not the adoptive admission was established by the government and whether or not based on that adoptive admission being potentially admissible trial, the guilty plea that was entered, the only issue preserved for appeal before this court is whether or not that adoptive admission is subject to Crawford. And I suggest that the record below, the record before this court, the appellate brief and the issue preserved suggests that the question of whether it's an adoptive admission has already been resolved. And I think moving from whether or not it's an adoptive admission to whether Crawford applies, this court has already recognized that an adoptive admission is the admission and statement of the defendant, and therefore Crawford does not apply. Thank you, Mr. Everett. Thank you. Your Honors, I might agree with the government if we weren't dealing with the procedure. Pull that down a little bit. Certainly. I might agree with the government regarding the procedure if it were not testimonial hearsay. And I believe that because it's testimonial hearsay with regard to the Crawford analysis, this court is bound to apply Crawford in finding that the indicia reliability, which the Constitution, the Sixth Amendment requires, is simply not present in this case. It's an inappropriate procedure, and this court should find so and reverse the district court's denial of her motion to suppress. Was she warned, I'm going to the second time, this is really the third time, the second time on January 15th. Was she warned before that? She was. There is evidence she was given Miranda warnings. I do not believe, though, however, the government represented that there's evidence that she orally waived those. I have not found any evidence in the record to support that. There is evidence that she was given her Miranda warnings. But, again, in your case, I apologize, I can't remember how to pronounce it. The V case, call it. Yes. That simply can't be enough to allow the police to come back and give Miranda warnings. Again, this test, I believe the court realizes the test is not, was she smart enough, did she have the wherewithal, was she able to, again, assert her right. She asserted her right. That's enough.  So the record is that she was warned, but the record doesn't reflect whether or not she assented either verbally or in writing? Not to my knowledge. No, I don't believe there's any evidence that I was able to find it. But Mitchell gave a written waiver or an oral waiver? An oral waiver on the record with regard to his right to counsel because he had invoked the right to counsel. Ms. Lafferty did not. Also, the district court, the government relies upon the district court. Go ahead. Well, the government relies upon the district court's finding, which is paragraph 27 of the findings of fact on Appendix G, which is the first Lafferty 1 case. The defendant and Mitchell spoke together for approximately 15 minutes. Wilgogs asked twice if they were ready to talk, and they said no. But on the third time, the defendant and Mitchell indicated to Wilgogs that they were ready to talk. This is inconsistent with the finding just several paragraphs down, 41, the defendant and Mitchell were verbally advised their Miranda rights, pardon me, 42. The defendant never expressly indicated to Wilgogs or Thomas that she had changed her mind and wished to be interviewed again. What's being – there's a logical disconnect here. Is the – what the government was attempting to put in adoptive admissions by her statements and or silence, is that correct? That's correct. Then how is Mitchell's statements nothing more than context? Mitchell's statements weren't for that. It wasn't his adoptive admission. Mitchell's statements themselves are not admitted for their truth. They are admitted for their truth because the court – They are? How? The government wished to introduce his statements as adoptive admissions, that when he said, we drove to the mountain – You can't do that. No. She has to adopt his statements by her actions or silence. Correct. So it was his statement was his statement. His statement is his statement. Her reaction to that was her adoptive statement, i.e., her statement. And the court decided that the jury should determine whether or not by her silence or her statements or her detail that she provided on occasion throughout this joint interrogation that she was effectively adopting his statements as her own, which of course – But his statements themselves, they're not admitted for their truth. They're not hearsay. His statements, what they're trying to put in is her reaction to his statements being admitted. You're saying this was an adoptive admission case. She adopted things that he admitted. That's the – What he said he admitted, however, isn't admitted for its truth. It is if the jury finds that she adopted it. And that's just a legal fiction. No, no. But then she's adopting it as if she's saying it. I understand. But, Your Honor, I believe that that just is a fiction under the rules of evidence, which is exactly what Crawford said is not sufficient under the Sixth Amendment right to confront witnesses against you.  I'm sorry. If the jury finds that she adopted these statements, then they come in. If the jury finds that she didn't because they're under the rules of evidence, her statements. She is, of course, not the actual physical declarant, but under the rules of evidence she's deemed to be the declarant. All I'm saying logically, it isn't what Mitchell says. It's what she does in reaction to what Mitchell says that they're trying to use against her. That's true. That's true. And then it goes further, of course, that if the government should not prove beyond a reasonable doubt that by her silence or her statement she adopted it, they can cure any prejudice by simply advising the jury not to consider those statements. That's a separate. But, again, if the court would find that her. . . That's a much more difficult argument for you to win on, it seems to me. The adequacy of the instructions, that's a much more difficult because you've got a lot of case law on that. But it is pre-Crawford, or it deals with non-testimonial evidence, and I'm going to ask the court to really consider that distinction. It was prior to Crawford. It was applying the Ohio v. Roberts test, which stated when there's a firmly established exception to the hearsay doctrine, then that's sufficient evidence of reliability. Crawford abandoned that insofar as testimonial hearsay is concerned, only testimonial hearsay. And, in fact, the two cases that the government relied on, in which I erroneously stated in my reply brief that you couldn't tell whether they were testimony or not testimony. In fact, it's clear from the context of those cases. I re-read them last night. They are non-testimonial hearsay, and they apply Ohio v. Roberts because it was in the context of that 2255. Okay. Ms. Monson, thank you very much. Thank you very much. Thank you. Taking the matter under advisement, the next case is Leckie v. Stefano.